CHRISTOPHER MALLOY, Respondent, *v.* THE NEW YORK REAL ESTATE ASSOCIATION, Appellant, Impleaded with NATHAN T. PORTER et al.

1. NEGLIGENCE — GUARD FOR ELEVATOR OPENINGS — NEW YORK CITY CONSOLIDATION ACT. In a case governed by section 487 of the New York City Consolidation Act (L. 1882, ch. 410), as amended by chapter 566 of Laws of 1887, in the absence of direction on the part of the superintendent of buildings, the adoption of either one of the three methods provided by the amended statute to protect freight elevator floor openings, namely, a substantial railing, or trap doors, or both, operates to save the owner of the building from being charged with negligence solely on the ground of non-compliance with the statute, where the method adopted by him is the usual one.

2. METHOD OF GUARDING ELEVATOR. In such case, a charge of negligence cannot be based solely on the omission to adopt one of the other methods in guarding an elevator opening rather than the one chosen.

3. CHAIN IN LIEU OF RAILING. *It seems,* that providing a chain to guard an elevator opening on the ground floor, permanently fastened to the building at one end and attachable at the other by a hook and staple, is, when shown to be generally used for that purpose, properly deemed a "substantial railing," within the meaning of the statute.

4. CHAIN IN LIEU OF RAILING. *It seems,* that the distinction between providing a chain and providing a railing, at an elevator floor opening, is too narrow to furnish a foundation for charging damages against a party for an injury which was the direct result of the negligence of another.

5. PROXIMATE CAUSE OF INJURY — NOT METHOD OF GUARDING ELEVATOR, BUT OMISSION OF ANOTHER TO USE GUARD PROVIDED. The guard for elevator floor openings, contemplated by the statute, is necessarily movable; and if either a movable railing or a movable chain is suffi-

cient to guard the opening, if left in a proper position, it is not the act of the owner in providing a chain rather than a railing, which is the proximate cause of an accident, where another has omitted to put the chain in position during the absence of the elevator, but rather the act of such other person.

*Malloy* v. *New York Real Estate Assn.*, 13 Misc. Rep. 496, reversed.

(Argued May 9, 1898; decided June 7, 1898.)

APPEAL from a judgment of the General Term of the late Superior Court of the city of New York, entered July 22, 1895, affirming a judgment in favor of plaintiff entered upon a verdict, and an order denying a motion for a new trial.

This action was brought to recover damages for personal injuries, alleged to have been caused by the negligence of defendants.

The facts, so far as material, are stated in the opinion.

*Herbert C. Smyth* for appellant. No negligence was proven against the defendant-appellant. (L. 1890, ch. 398; *Flannigan* v. *American G. Co.*, 11 N. Y. Supp. 688; L. 1887, ch. 566, § 15; *Boehm* v. *Mace*, 18 N. Y. Supp. 106.)

*Harcourt Bull* and *Lester W. Clark* for respondent. . No error was committed in denying the defendant's motion to dismiss the complaint. There was evidence sufficient to carry the case to the jury, both on the question of defendant's negligence and also on the question of plaintiff's freedom from negligence. (*Jetter* v. *N. Y. & H. R. R. Co.*, 2 Keyes, 162; *Knufle* v. *Knickerbocker Ice Co.*, 84 N. Y. 488, 491; *McRickard* v. *Flint*, 114 N. Y. 222, 227; *Minerly* v. *Union Ferry Co.*, 56 Hun, 113, 115; *Hanrahan* v. *Cochran*, 12 App. Div. 91, 94; *Pitcher* v. *Lennon*, 12 App. Div. 356, 359; Factory Act, § 8; L. 1886, ch. 409, as amended by L. 1890, ch. 398; *Irvine* v. *Wood*, 51 N. Y. 224, 228; *Ahern* v. *Steele*, 115 N. Y. 203, 209; *Timlin* v. *Standard Oil Co.*, 126 N. Y. 514, 526; *Reynolds* v. *Van Beuren*, 155 N. Y. 120, 125; *Matthews* v. *De Groff*, 13 App. Div. 356, 361; Wood on Nuis. 23; *Heeg* v. *Licht*, 80 N. Y. 579, 582; *Peil* v. *Reinhart*, 127 N. Y.

381, 384; *Dollard* v. *Roberts*, 130 N. Y. 269, 273; *Glushing* v. *Sharp*, 96 N. Y. 676, 677; *Fitzgerald* v. *L. I. R. R. Co.*, 10 N. Y. S. R. 433; *Palmer* v. *N. Y. C. & H. R. R. R. Co.*, 112 N. Y. 234, 241; *Kane* v. *N. Y., N. H. & H. R. R. Co.*, 132 N. Y. 160, 164; *McNamara* v. *N. Y. C. & H. R. R. R. Co.*, 136 N. Y. 650, 653; *Manley* v. *N. Y. C. & H. R. R. R. Co.*, 18 Misc. Rep. 502, 504; *Wilber* v. *N. Y. C. & H. R. R. R. Co.*, 8 App. Div. 138, 142; *Morrison* v. *Metropolitan Tel. Co.*, 69 Hun, 100, 103; S. & R. on Neg. [4th ed.] § 92, pp. 140–143; *Johnson* v. *Belden*, 2 Lans. 433, 438; 47 N. Y. 130; *McPherson* v. *City of Buffalo*, 13 App. Div. 502, 503; *Evans* v. *City of Utica*, 69 N. Y. 166, 619.)

PARKER, Ch. J.    The defendant, in May, 1890, owned, but did not occupy the premises 19–21 Thomas street, New York. It leased the ground floor, cellar and sub-cellar to J. L. Bailey & Co. and Jonas Brooks & Co., and all of the rest of the building to Porter Bros. & Co.    A steam freight elevator ran from the top floor to the sub-cellar, the motive power being furnished by the defendant.    The operation of the elevator was entirely controlled by the tenants.    On every floor except the ground floor there were trap doors.    At the latter the elevator shaft was five feet and ten inches inside of the building line, and this hatchway had a storm door and iron doors which closed it up entirely in non-business hours.    At other times a chain, one end of which was permanently fastened on the easterly side of the building and the other end caught into a staple by means of a hook, barred the way to the elevator shaft.    The reason assigned for using a chain instead of a trap door at the ground floor is that the fire department required the elevator to be left on a level with the street when not in use, so that in the event of the building being broken into in case of fire, the firemen would not fall down the shaft. It appears from the testimony of the plaintiff, who was a drayman, that the freight elevators in that neighborhood were similarly guarded.    For more than seven years the plaintiff had been accustomed to take to and from this elevator cases

of goods, and, as he testified, was familiar with it and its approaches on the ground floor.

Between 12 and 1.30 o'clock of a bright sunshiny day, the plaintiff, supposing that the elevator was at the ground floor, attempted to step into it, but instead stepped into a well hole and received serious injury.   Only a few, if any, minutes had elapsed since Charles Maxson, an employee of one of the defendants, had entered the elevator and ridden on it to the floor above, where it was at the moment of plaintiff's fall. Whether Maxson unhooked the chain from its staple and hung it up by the side of the elevator is a subject of controversy. But that someone wholly unconnected with the defendant did it is firmly established.

The plaintiff's story of the accident and the circumstances surrounding it, as told on his direct examination, is as follows :

"I had been in the habit of using this elevator for about seven years prior to the accident, on and off.  The first time that I ever rode on that elevator, that I can remember, was when the building was built ; in 1871, probably ; I wouldn't swear to that.   I became quite familiar with the elevator — the approach to the elevator on the ground floor."

"I came from Church street up towards the store.   J. L. Bailey's porter, Thomas Gorman, was on the walk, getting a case preparatory to shipment ;  *  *  *   he told me  *     * there was another case downstairs going in the same direction (Mallory Line Steamship Company) for Jonas Brooks & Co. ; I had heard of that previously, and passing by I looked to see if the elevator had been there, as I wanted to use it immediately, and the elevator was there.   I noticed the chain.   It was hooked up on the easterly side of the building, not across.  *  *  *   The elevator was on a level with the sidewalk.   I went for my truck to Church street and then came back, and I could not come within fifteen or twenty feet of where the case was.  *  *  *   I backed in nine or twelve feet west of the lamppost.   I still seen the chain in the position in which it was when the elevator was there.   I was in a hurry to get the goods away.   It was on the 29th of May, and

we were to have three holidays, Friday, Saturday and Sunday, and I wanted to get everything cleaned up. I went for the elevator, to rush over diagonally across — I couldn't see the elevator; it was dark — I went with a rush and could not stop myself and went in the cellar — thinking the chain was still hanging up in the position I had seen it."

On cross-examination plaintiff testified as follows: " I took a diagonal look across and saw the chain as it was when I passed it by. I could see the chain but not the elevator. When I say I took a diagonal look, I mean to say that the westerly pillar came between me and the elevator as I sat on my truck. * * * Q. Now, what did you do then ? A. I ran for the elevator — I took a run. I didn't walk. I ran to the elevator in my great haste to get through my work as soon as possible, and do it all that day. I couldn't tell you whether I ran a three-minute gait or less. I ran a good gait in my great haste to get up .the case. * * * I couldn't stop myself, I went with such great haste. I did not intentionally jump in the elevator shaft; I was not going to commit suicide."

The story may be told still more briefly. When the elevator was at the ground floor the occupants of the building were not accustomed to have the guard placed across the opening into the elevator, because no accident could happen while the elevator remained in that position. The plaintiff with this knowledge glanced at the elevator before going after his horse and saw that the elevator was in position at the ground floor and the chain hung up by the side of it. When he returned, which he did in great haste, he saw the chain still hanging up, and supposed that the elevator was in the position which the chain indicated, and so rushed on into the elevator shaft. He was relying upon the well-understood rule of the occupants of the building that the chain should be stretched across the opening to the elevator shaft whenever the elevator should be taken from the ground floor, a rule which, if faithfully observed by all of the occupants of the building and their employees, would have prevented the accident; but,

27

instead of being observed it was violated, and the result was the injury for which a judgment has been obtained against this defendant. It is not pretended that this defendant or any of its agents or servants moved this elevator from the ground floor to the floor above while the plaintiff was trying to get his horse near the elevator entrance. On the contrary, all of the evidence points in the direction of Maxson, an employee of one of the occupants of the building, as the man who carelessly moved the elevator to the floor above, leaving the well hole unguarded.

Notwithstanding the fact that the negligent act which was primarily responsible for the accident is distinctly pointed out and found to be an act which the defendant neither committed nor was legally responsible for, a judgment has been obtained against it for the damages sustained by the plaintiff. This liability was worked out to the satisfaction of the court and jury upon the following lines: The defendant failed to furnish such a guard at the elevator shaft as was required at the time by the Factory Act or the Building Law, and it is established by many cases that a failure to comply with the requirements of a statute is competent evidence of negligence to be submitted to the jury. By this process of reasoning it is insisted that the defendant is legally chargeable in damages for the injuries clearly occasioned by the fault of another, as we have seen. Whether this position be well taken we shall now inquire. The learned judge at General Term held that the Factory Act (Laws 1887, chap. 462), has no application to this case, as the building was not a manufacturing establishment within the meaning of the statute. We pass this question without other comment than that we agree with the position taken by the General Term. That learned court also held, and correctly we think, that section 487 of the Consolidation Act, which constitutes a part of the Building Law, was applicable. Counsel, however, seem to have made a mistake in not calling the attention of the court to the last amendment of that section, with the result that the court assumed in its discussion that that section, as amended by chapter 410 of the

Laws of 1882, was in force at the time of the happening of
this accident.  The court correctly stated the effect of the
statute as amended by the act of 1882 to be that it "requires
that the opening in each floor of such a building shall be pro-
tected by such a substantial railing, and trap doors to close
the same, as shall be approved by the superintendent of build-
ings, and that such trap doors shall be closed at all times,
except when the elevator is in actual use."

It will be observed that in the statute referred to by the
court, both substantial railings and trap doors are required to
be used to guard the entrance to the elevator shaft, and such
was the condition of the law when the accident happened out
of which the action of *McRickard* v. *Flint* (114 N. Y. 222)
arose.

Prior to the happening of this accident it was amended so
as to read as follows: "In any building in the city of New
York, in which there shall be any hoistway or freight elevator
or well hole, not inclosed in walls constructed of brick or other
fireproof material, and provided with fireproof doors, the
openings thereof, through and upon each floor of said build-
ing, shall be provided with and protected by a substantial rail-
ing, or with such good and sufficient trap doors with which to
close the same, or both, as may be directed and approved by
the superintendent of buildings, and such railings and trap
doors shall be kept closed at all times, except when in actual
use by the occupant or occupants of the building having the
use or control of the same."    (Laws 1887, chap. 566, § 487.)

In the *McRickard* case the statute required both guards,
and both were omitted, and this court decided that the failure
of the superintendent of buildings to give directions could not
constitute an excuse for the absence of the guards.  But as
the statute now stands two kinds of guards are mentioned,
each or both of which may be used "as may be directed and
approved."   Thus the superintendent of buildings is permitted
to exercise his discretion.  He may direct that a railing be
used, or that a trap door be employed as a guard, or that both
a railing and a trap door be used.  In the absence of direction

on the part of the superintendent, it would seem that the adoption of either one of the three methods provided by statute would operate to save the owner from being charged with negligence. solely on the ground of non-compliance with the statute. It is unnecessary to consider whether there might not be special circumstances surrounding a given situation which would call upon a prudent owner to make such a choice of statutory methods as would permit a jury to find him guilty of negligence for the choice made, but there are no such facts present in this case. The method selected was, on the contrary, the usual one for the ground floor as appears by the testimony of the plaintiff. Under such circumstances it may be safely asserted that a charge of negligence cannot be based solely on the omission to adopt one of the other methods of guarding the well hole rather than the one chosen.

But the respondent says the owner did not provide a railing, he provided a chain instead. This distinction certainly seems too narrow to furnish a foundation for charging damages against a party for an injury which was the direct result of the carelessness of another. It is not pretended that a railing of iron, or wire or wood, would have been stronger or more serviceable in any way than this chain. It appears from the testimony of the plaintiff that chains were generally used to rail in shaftways of elevators in the vicinity of the premises in question. It thus appears that the chain was treated, as it might well have been, as a "substantial railing" within the meaning of the statute. But if we assume that the chain is not a technical compliance with the statute, we must still reach the conclusion that the defendant is not liable for the reason that its act in furnishing a chain instead of a railing did not occasion the injury. If a rail had been used instead of a chain the result could not have been different. The statute provides that "such railing and trap door shall be kept closed at all times except when in actual use." This contemplates necessarily that the railing must be a movable railing such as this chain was. Whatever might have been used as a railing, whether made of wood, iron bars, or even iron links, would

have been movable at the pleasure of any one desiring to use the elevator, so as to leave the elevator open or closed, as work or prudence should require. There is nothing in the character of such a railing as the statute requires as enables it to protect an elevator shaft against the malicious or careless act of a party who leaves it open when he moves the elevator. Either guard is powerless to bar the ingress of the heedless into an elevator well hole if deliberately left open by persons operating the elevator. If either be sufficient to accomplish that purpose, if left in proper position, it would seem to follow that it is not the act of the owner in providing the one rather than the other, which is the proximate cause of the accident, but rather the act of him who puts away the guard and refuses to permit it to perform its office of protecting the well hole during the absence of the elevator. For the act of the person who deliberately moved the elevator, leaving the well hole unguarded, this defendant is neither morally nor legally responsible and should not be visited with its consequences.

There are other exceptions upon which a reversal might well have been based, but we prefer to rest our decision upon the ground that this defendant was not at fault.

The judgment should be reversed and a new trial granted, with costs to abide the event.

All concur.

Judgment reversed, etc.